Good morning, Your Honors. May it please the Court. My name is Keith Hiltzendegger. I'm from the Office of the Federal Public Defender in Phoenix. And I represent the defendant in this matter, Richard Felix. Before I talk about the main issue, the main evidentiary issue in this case, I wanted to say a few words about the sentencing claim here. I don't know anything about the prior conviction in the Pollack case, but the way that the sentencing claim in this case comes to the Court, it seems to me, as we've conceded in our reply brief, that Terrell and Park foreclosed the claim in this case that the 2004 burglary conviction isn't a crime of violence. And so, unless the Court has any other questions about the specific sentencing claim in this case. No, we appreciate your candor and acknowledgment of the restraints. Thank you. So why don't you argue on the evidentiary point? The evidentiary issue in this case, Your Honor, is, to borrow a metaphor from current events, about a red line. Should the government, should the prosecution in this case be permitted to impeach his own witness when an objective review of the record reveals that he has good reason to believe that this witness will decline to give helpful testimony, and when the evidence he characterizes as impeachment is actually an admissible hearsay? Well, let's just start with the premise, because I don't read the record as supporting an objective belief that the prosecutor, you know, had reason to believe that this witness was going to not provide helpful testimony. And I guess the strongest piece of evidence that I'd like you to address is that you weren't trial counsel, right? I was not trial counsel. But trial counsel did not object on this basis. And he had an opportunity to interview the witness before this little colloquy occurred, right? Trial counsel did have an opportunity to interview this witness. And his objection, I'll concede, was not perhaps the clearest. He didn't cite chapter and verse on the Federal Rules of Evidence. But he did say that because of the difficulty, the conceptual difficulty that a jury would have in distinguishing in this particular context between out-of-court statements introduced for the purpose of undermining the witness's credibility and out-of-court statements introduced for the purpose of inculpating the defendant, there would be difficult to cure that kind of error, to clear that kind of distinction up in the jury's mind through the use of a curative instruction. Let's back up. But I'm talking about that colloquy that occurred before, I guess, the witness ever got on the stand. Right. The prosecutor says, I think, I think we're going to have issues with this witness, something to that effect, right? You would say that. But the issues, I think, that at least as I read the record, that were in the prosecutor's mind were more that she was going to blurt out things that shouldn't, that the jury shouldn't hear, not that she was going to basically go south on him, right? And that's what I'm saying. It seems to me if the defense lawyer really had a, if there really was a basis to believe that this witness was not going to actually testify consistently with her prior statements, the defense lawyer would have said, Your Honor, absolutely not. This, all they're going to do is put her on the stand, and she's going to deny that she ever made these statements or ever saw anything. And the whole point of them putting her on the stand is so that they can then impeach her with these otherwise inadmissible statements. The defense lawyer never said anything like that. He didn't say anything like that during that pre-trial or that particular conversation that you're talking about, Your Honor. Because at that point, I suppose defense lawyer could have wanted to just see what she would do. It, it. Well, could I stop you on that? This is where, like, everybody's a little bit into the fray here, because I thought the defense, they had talked about impeaching her with her conviction, and that was a defense line of attack, correct? Yes. Both parties were. Okay. So the defense is like anticipating she's going to get up there, and you wouldn't need to impeach her with her conviction if you thought she was going to turn tail on her testimony. So that's kind of inconsistent with the whole argument. Defense counsel also alluded to the fact that the witness was afraid of inculpating the defendant. She didn't want to be a snitch. She didn't want to be a snitch. I think he used those words. He didn't want to be a snitch, but why would he need to prepare to impeach her if he thought she wasn't going to sort of tell what happened? I mean, so in other words, I don't think anyone thought she was necessarily going to turn upside down. I think that from the perspective of defense counsel, before any testimony has been presented to the jury, when defense counsel says, look, I'm afraid she might be a snitch, that's kind of a windfall for him. And at that point in the proceedings, it might be a reasonable strategy for him to just sort of sit on his hands and say, well, I know she has this prior conviction. If I need to impeach her, I could rely on that and wait and see what the government was going to do. I guess it wasn't clear at that point that what the prosecutor and the case agent would do is sit down with this witness and review the recording of the interview that contains these statements that ended up being so monumental. But knowing that she was potentially going to be a snitch, knowing that, if necessary, her prior conviction would be available to impeach her credibility, I think, you know, defense counsel was not really interested in tipping his hand too much at this threshold question. Why couldn't the prosecution simply presume that his witness is going to tell the truth? And I mean, there was evidence independent of her that would implicate the defendant in any event. But, you know, the prosecutor could presume that his witness is going to tell the truth. And so that sort of undermined the argument that he called her simply to impeach her. I mean, on that basis alone, the belief that your witness is going to testify consistently, notwithstanding the fact that he knew that she was afraid and concerned about being called a snitch. I think it's reasonable to you for the prosecutor to believe that the witness would have said that the evidence are highly inculpatory. But the prosecutor also said that he knew that this witness was afraid, that the witness had said, you know, repeatedly during this recorded interview that she was afraid of Mr. Felix, that she knew that he was a member of a dangerous gang, and that because of that, he, you know, she may not behave as he would otherwise reasonably anticipate, as Your Honor has said. He knew that was a possibility. He knew that was a possibility. But he wasn't certain. He probably also knew that it was a possibility, an equal possibility, that she would testify consistently. I think that's fair to say, that, you know, he wasn't 100 percent sure what she would do. With the Court's permission, I'd like to reserve the balance of my time for rebuttal. Thank you. Mr. Boyle. Good morning. May it please the Court. My name is John Boyle. I represent the United States. Regarding the issue of whether the government had good reason to know, I would just point you to some of the pieces of the record that you'll look at that may help you make your decision. The first is we have a witness who was subpoenaed and showed up. And you also see in the record that when she arrived at court, she also agreed to sit down with the case agent and review her entire statement because it was on a videotape or a videocassette or an audio cassette with the agent. So she appeared and she sat down and she reviewed her whole statement. To the question of the fact that she said she was scared, she also said she was scared on the night of the incident. And yet, even though she was scared back then, she sat down with the detectives and gave a full recorded statement. You have the defense counsel who did, in fact, interview her prior to trial where the government had not. And to the question of whether or not the defense attorney intended to impeach her, I think the only thing you can do is look at the record. And in DR-79, the statements we have are the government telling the court she has a prior felony conviction and the court asking who's planning to bring that out, the defense counsel saying me. So the fight then became whether or not it should be sanitized or not. And the defense was asking that the nature of the prior felony come in. So you have objectively the defense saying, I plan to impeach this witness, and the defense was in a superior position to know how she would testify because they had interviewed her. Kennedy. Can I ask you this? Let's say that we agree with you on the reason to know. Okay. Wrong, right? But she does get on the stand, denies having made – she denies having seen anything and then denies having made these statements to the officers. Right. It seems to me the closer question is whether on a 403 balancing at that point, the officer should be allowed to get on the stand and introduce what – I think all of us, probably yourself included as a prosecutor, would agree there's no way a jury can follow that limiting instruction, put out of their mind the truth of what the officer – or the truth of the statements the officer is going to offer. Right? I mean, it just defies human abilities. So why on a 403 balancing shouldn't the district court have said, you know what, maybe you didn't have any reason to believe that this was going to happen, but she just denied that she saw anything and then denies having made these statements. So I just – I'm not going to let it in. I guess to me that's the closer question. So the first question is the witness testifies. Does she provide damaging testimony? And Judge Bolton, who's a very experienced judge, listened to her testimony and decided there was damage here. And so you would look at the record and say, well, what was the damage? And so you have at the ER-124 some of the following statements. And this is regarding Bernal. Did you tell the officers you had a discussion with Richard Felix? No. Did you tell them that you had information about guns? No. Did you tell them that Richard Felix was holding a shoebox? No. Did you tell the officers that you saw a handgun in the box? No. So you have testimony there that was, from the record, damaging. She's denying these things that happened. But, I mean, that's – first of all, I'm not even sure that it's damaging. It's not helpful to the government's case. I don't dispute that. But, look, it's sort of self-inflicted damage. I mean, she got up there. She had already gone south, denied that she had seen anything. Why should the government then be able to flip more damage on itself by asking these questions at that point? It should certainly know she's not going to be helpful then, and then say, oh, my God, Your Honor, she's just destroyed our case. Now we must impeach her. That just seems – I don't follow that. Because the second point is, how do the parties argue this? And you see in this case that the defense, just by the mere fact that she says she doesn't see him and denies making all these statements, the defense uses that in their mere presence defense, and they argue it in closing argument. So you see that the defense is using this piece of evidence, and the reasonable doubt instruction says that the absence of evidence can be used to provide reasonable doubt. And in this closing argument, the defense attorney says her testimony was that she did not see Mr. Felix carrying a box. Her testimony was the only testimony you can use is that she provided here in court and that she did not say he was carrying a shoebox with these weapons. So the defense used what you would say is just merely nonaffirmative evidence. But they say, no, actually, that is affirmative evidence that this eyewitness did not see him with those things, and you can use that against the government. And that's why, in many ways, I think this case is like United States v. Gilbert, where the witness came in and unexpectedly, and there were two of them, said the defendant did not have a gun and did not point a handgun at a witness. And the Court in Gilbert affirmed, and they said, you know, even though they did not testify as you would expect it, because that information damaged your case, you were allowed to impeach them. So I guess I dispute the idea that it was not affirmatively damaging. And I would say it's not. Sotomayor, what came at the end of the trial, is that right? It did. Well, that seems not very hopeful or timely in the context of all the brouhaha when she testified. Is that sufficient? It is sufficient. Now, this Court has said that it prefers that the instruction be given close in time to when the testimonies happen. But there – it is sufficient, because in going back to the premise of do jurors follow limiting instructions, and I think this in some ways conceptually is difficult, because under Rule 609, impeachment, you know, we don't consider the prior felony conviction at all but for credibility. We expect the jurors to do that. Under 607, it's the same thing. The system, it really is predicated on the idea that you have to presume they follow the instruction. And as trial attorneys and trial judges know, and you do as well, that jurors really try to follow the instructions, at least from my experience. I'm hopeful that's your experience as well, that they do their best to follow those. As difficult as you might say is, how can you put that out of your mind? I'm really hopeful that they do. And the reason is, you can't have a rule like 609 or 607 if we don't presume that they follow the instructions. You could never allow something like that. And as a trial judge, we always, I think that trial judges for the most part, try to issue curative instructions at the time the issue arises, because those other instructions are all considered together. You know, you give a general impeachment instruction at the end, and that is giving them a construct of how to view the evidence. But this is an isolated case, and for something as critical and crucial as that, it would have made more sense to have given the curative instruction at the time of Bernal's testimony. So would it then, since it was given at the end, not be, would it be harmless error? It is, again, preferable to do it at the time. And I think you get to the main point, which is you have to then look at the whole record and say, was this piece of information in the time of the instruction, was this error for the court to do this? And I think you have to then go to the strength of the case. And this is a case that was overwhelmingly strong. You have a fingerprint on a magazine, a fingerprint on a box of the defendant's, a fingerprint of a pipe next to the handguns that are in a box. He's wearing the shoes that Max took box. The first officer says stop. He goes into the house. Another officer orders him to stop with a canine. The defendant looks at the officer, continues to run. If the fingerprint evidence wasn't overwhelming enough, you have the defendant's conduct and everything else in this case, which is overwhelming evidence, far surpassing most cases where we rarely have the actual fingerprint on the weapon basically in the defendant's possession at the scene. So in that context, there's no error here when the instruction wasn't given at the precise time, but it was given at the end of the case. And the courts do say that when you give the limiting instruction at the end of the case, we presume that the jurors follow it. And I go back to one more point, which is Judge Bolton, regarding whether or not, you know, this was damaging to the government's case. She was there. She saw the testimony. The defense, when had an opportunity to ask cross-examination, has zero questions of Ms. Bernal on cross-examination. They had known from her testimony the damage. And I think in this record, you can see that Judge Bolton did as well. If there are no other questions, thank you very much. Thank you. Picking up on Judge Watford's questions, I'd like to shift my argument to the 403 issue, which, incidentally, both parties agree is fully preserved. And my reading of Gilbert is that there's no 403 issue in Gilbert. So to the extent that the, you know, just this balancing of probative versus prejudicial will drive this Court's analysis, Gilbert doesn't control that here. As to the harmlessness question, I agree with Mr. Boyle that it basically boils down to the fingerprints, but I'm not sure that the fingerprints necessarily make the government's case or demonstrate that there's powerful, overwhelming evidence. This Court has said that the fingerprints have to appear on this object that was otherwise inaccessible to the defendant before the crime was committed. The shoebox was accessible to the defendant before the crime was committed because he was wearing this virtually brand-new pair of shoes. The shoebox was presumably the box that the shoes came from. So he may have bought this shoebox sometime before, you know, the afternoon of December 10. Ms. Pena's prints were also on the shoebox. You know, that at least gives a question as to whether or not Mr. Felix had exclusive or concurrent, at least, dominion and control over the shoebox when it contained the firearms and the ammunition and the drug paraphernalia that was in it. There was no testimony that Mr. Felix's fingerprints were on any ammunition, just a magazine, and the owner of the Ace Hardware store testified that at least at the time that the magazine was stolen, it contained no ammunition. As far as I understand, it's not illegal to possess a magazine unless there's also ammunition in it in the context of a felony possession case. And as Judge McHugh pointed out, it really would have been better for the district court to give this limiting instruction when Detective Reeves testified, which, by the way, was the morning of the second day of trial. It was the first witness the jury heard. And that would have been sort of an ideal moment when everything was fresh for the instruction to be given so that the jury would have the right amount of guidance for evaluating this testimony. If there's no further questions, thank you very much. Thank you. Thank you, counsel, for your argument this morning. The United States v. Felix is now submitted.
judges: Marbley, McKeown, Watford